IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  11-cv-01424-CMA-MJW


SHAWN D.  ALLEN,

Plaintiff(s),

v.

K.  FERREL [sic],[1]
E.  SNEAD,
J.  LIBEL [sic],[2] and
R.  KORTH,

Defendant(s).

---

## RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 72)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**


This matter was referred to this court pursuant to an Order Referring Case issued

on November 14, 2011, by Judge Christine M. Arguello.  (Docket No. 9).

## PLAINTIFF'S ALLEGATIONS

The pro se incarcerated plaintiff asserts the following in his Amended Prisoner

Complaint (Docket No. 10).

---

[1]The correct spelling of defendant's name appears to be Farrell, although even her affidavit contains two different spellings (see Docket No. 72-1).  The court will use "Farrell" throughout the remainder of this report and recommendation.

[2]The correct spelling of defendant's name is Libal.  (See Docket No. 72-4).  The court will use the correct spelling throughout the remainder of this report and recommendation.

2

**Claim One:   1st. 5th. 8th and 14th Amendants [sic] Retaliaton/Substantive Due Process/Et Cetera.**  On August 31, 2010, plaintiff became "overwhelmed due to an anxiety condition [he] suffer[s]."  (Docket No. 10 at 5).   He contacted defendant Farrell, a mental health worker for Buena Vista Correctional Facility ("BVCF"), explained his situation, and assured Farrell that although he had suicidal ideations in the past, he was not suicidal at that time.  In fact, plaintiff referred to himself as a "suicidal coward," but he expressed how his high anxiety had provoked sleep deprivation and thus asked to be kept in a room by himself in order to get much-needed sleep.  Farrell agreed.  She told plaintiff she would have him moved to "upper north" unit and put in a segregation cell with his basics (toothbrush, soap, etc.) and his legal property.  That unit would have been conducive to plaintiff's needs because it had single cells.  The captain, however, informed Farrell that the upper north unit was full.  Farrell called security staff and ordered plaintiff stripped naked and locked in a suicide watch cell.

Farrell's actions were in retaliation for plaintiff's filing of a Step One Grievance on the BVCF Mental Health Department in August 2010 and prior complaints plaintiff lodged against that department with the "U.S. Dept. Of Judgment" [sic] and the "State Grievance Board."  During a brief conversation with Farrell on August 24, 2010, plaintiff told her of these complaints, and she acknowledged the Step One Grievance.  Plaintiff said he would lodge more if the issue was not remedied.  These complaints, as well as a civil action plaintiff had filed against another mental health worker (Northrup - civil action no. 09-cv-00741-CMA), were also discussed during the August 31, 2010, visit. The close proximity of the lodging of these complaints and Farrell's unlawful act

3

demonstrates a causal connection.  Plaintiff's act of placing plaintiff in a suicide watch cell thus violated plaintiff's First Amendment rights.

The suicide watch cell in which plaintiff was placed was "utterly unsanitary." There was blood on the walls and floors, feces was smeared on the toilet and floor, the cell was ice cold, and there was no ventilation, so the "maloder" [sic] which permeated the cell was stagnant.  Plaintiff complained to security staff who said they would let Farrell know.

Plaintiff was trapped in that cell from August 31 to September 9, 2010.  The porter for BVCF segregation, Brian Martinez, has given plaintiff an affidavit saying that he was told to clean the cell after plaintiff was moved out, and there was smeared feces "caked up" on the side of the cell's toilet.  Farrell saw the unconstitutional conditions of confinements when she came to the cell on September 1.

Farrell violated plaintiff's right to equal protection.  She discriminated against plaintiff for having engaged in constitutionally-protected activities.  Two other inmates, Mark Havens and Josh Binns, were similarly situated but were treated differently.  While their conditions of confinement were "most deplorable," both were permitted to shower and to possess some items of clothing and hygiene items, whereas plaintiff was denied every request for such.  Plaintiff was arbitrarily put and kept in a frigid, filthy cell for more than a week, while others in segregation were permitted to clean cells, take showers, etc., which violates equal protection of the law.

On the fourth day, plaintiff became "critically ill" with flu-like symptoms, vomiting repeatedly, due to the unsanitary cell.  After he became ill, plaintiff requested medical care for several days on which he vomited, but those requests were denied.  The sink

4

and toilet in his cell were maliciously shut off.  Defendants' actions were outrageous and in violation of substantive due process.  Plaintiff suffered severe emotional distress.

Plaintiff was not permitted to clean the cell, shower, brush his teeth, wash his hands with soap, eat meals with a utensil, wear underwear, or have fresh air, exercise time, or reading materials.  The bright lights in the cell were on 24 hours a day.

Defendant Snead is equally culpable of having violated the above-listed rights.  On September 2, 2010, Snead came to plaintiff's observation cell and spoke with plaintiff, informing him that Farrell spoke with him about plaintiff.  Plaintiff told Snead he was not suicidal.  When plaintiff asked why he was on suicide watch, Snead stated, "I know you are not suicidal but this is the only cell available. . . . It was Ferrels [sic] order."  (Docket No. 10 at 9).  Plaintiff asked Snead if he could shower, brush his teeth, and clean the cell.  Plaintiff pointed to the blood and feces smeared in the cell.  Snead said he would see and there was nothing he could do.  Plaintiff threatened to lodge more complaints.

Day after day, Snead denied plaintiff's requests for necessities.  Snead could see that plaintiff was sick and the cell was filthy, heard plaintiff's repeated request for help, and ignored it all.  On September 4 or 5, Snead had plaintiff's sink and toilet shut off, and they were off for the several days that plaintiff was "critically ill."  Plaintiff would be thirsty, yet the sink was shut off.  He had urine, feces, and vomit piled up in the toilet for days.

Snead came by the cell on September 4, 5, 6, and 7, and each day Snead ignored plaintiff's request for medical attention.  Not once during plaintiff's nine days of suicide watch did a medical worker stop by to check on the plaintiff's welfare.  Plaintiff

asked to have water turned back on, to no avail.

Snead's actions were triggered by plaintiff's complaints against Snead's department, plaintiff's verbal complaints to Snead, and the "slew of cuss words" plaintiff "unleashed upon him [on plaintiff's] third day in cell." (Docket No. 10 at 11). Snead treated plaintiff differently than other prisoners who were similarly situated, such as Mark Havens and Josh Binns, who were in adjacent cells on suicide watch but were permitted by Snead to shower and brush teeth, whereas plaintiff was not.

**Claim Two: First and Fourteenth Amendments-Conspiracy-Harassment-Equal Protection-Access to the Court-Retaliation.** In October 2010 defendant Korth did a routine search of the plaintiff's cell at BVCF. Korth did not "trash" the room, but plaintiff noticed that his legal box had been searched and several legal envelopes were out of their systemized placement. Plaintiff spoke with Korth about the matter and asked that he refrain from future legal box searches because it is against DOC policy to read prisoners' legal papers. Since Korth was new to the facility and perhaps to the prison system and given the fact that no legal work was removed from the cell, plaintiff "did not fuss much." (Docket No. 10 at 13).

The following month, Korth searched plaintiff's cell again during which he again "forage[d] through [plaintiff's] legal box." Plaintiff was not in the unit at the time. Now plaintiff was "indignant." (Docket No. 10 at 13). At that time plaintiff had been "immersed in preparatory work, doing research and conducting interviews with inmates in regards to a class action against Ferrel [sic] and Snead." (Docket No. 10 at 13). He was also litigating other lawsuits, so he was "obviously . . . uncomfortable with having

[his] legal papers scrutinized." (Docket No. 10 at 13). Plaintiff again confronted Korth, and defendant Libal was present. They both heard plaintiff's "threat to formally complain to the shift commander - Captain Fisher." (Docket No. 10 at 13). The next day, plaintiff served Captain Fisher with a "formal declaration" against Korth, and plaintiff also apprised Major Dan Cotton.

On December 7, 2010, a different officer searched plaintiff's room. On December 15, 2010, Libal called plaintiff to the office for plaintiff to sign a grievance plaintiff had lodged. This was the third time Libal had handled a grievance plaintiff had filed on staff misconduct. On this occasion, Libal stated, "You need to stop with your complaints."

On December 18, 2010, although plaintiff had already had his cell searched for the month, Libal entered the cell alone while plaintiff was at work and "thrashed the place" (Docket No. 10 at 14), which was malicious harassment. Several recently-acquired affidavits plaintiff had stored in a folder under a newspaper on his desk were missing, as was the newspaper. Plaintiff confronted Libal, who stated, "All legal work must be stored in legal box." (Docket No. 10 at 14). Later Libal came over the intercom asking why plaintiff had other prisoners' legal work; it was against the rules.

Libal and Korth conspired to deprive plaintiff of equal protection of the laws. In response to plaintiff's verbal and written complaints, Korth let Libal into plaintiff's cell despite the fact that several other inmates had yet to have their cells searched. Both knew plaintiff had recently had his cell searched and that dozens of similarly-situated prisoners in the unit had yet to have their rooms searched. Libal took plaintiff's legal documents in conspiracy with Korth to thwart this case against the defendants in Claim

One.  It was done in retaliation.  Libal was aware of plaintiff's verbal threat to complain to Captain Fisher, regular visits to the law library, grievances lodged on several BVCF staff, and civil litigation.  Lieutenant Funstone told plaintiff she informed unit staff not to search plaintiff's legal box while he was out of the unit.  But for plaintiff's protected activities, Libal would not have entered plaintiff's cell on December 18, 2010, to deprive plaintiff of his legal documents.

Korth was working the control booth at the time of that search and buzzed Libal in electronically because there was no other way in.  Plaintiff thus contends these two planned in advance to violate plaintiff's civil rights.  They work side by side throughout the week.  On December 18, 2010, as plaintiff returned to the unit from work, he saw Libal and Korth speaking amongst themselves.  The inmate in the cell near plaintiff's informed plaintiff he heard Libal talking to Korth over plaintiff's speaker.

Plaintiff's access to the courts was prejudiced (particularly Claim One of this action) as a result of Libal taking affidavits from plaintiff's cell.

Plaintiff seeks compensatory and punitive damages for the physical and emotional pain suffered as a result of the violations in Claim One, and compensatory and punitive damages for Claim Two, albeit he suffered no physical or emotional injury.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now before the court for a report and recommendation is the defendants' Motion for Summary Judgment (Docket No. 72).  Plaintiff filed a Response (Docket No. 72), and defendants filed a Reply (Docket No. 95).  The court has carefully reviewed these motion papers as well as applicable Federal Rules of Civil Procedure and case law.  In addition, the court has taken judicial notice of the court file.  The court now being fully

8

informed makes the following findings, conclusions of law, and recommendation.

Rule 56(a) provides that summary judgment shall be granted "if the movant
shows that there is no genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party seeking summary
judgment bears the initial responsibility of informing the district court of the basis for its
motion, and identifying those portions of the pleadings, depositions, interrogatories, and
admissions on file together with affidavits, if any, which it believes demonstrate the
absence of genuine issues for trial."  Robertson v. Board of County Comm'rs of the
County of Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo. 1999) (citing Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986); Mares v. ConAgra Poultry Co., 971 F.2d 492, 494
(10th Cir. 1992)).  "Once a properly supported summary judgment motion is made, the
opposing party may not rest on the allegations contained in the complaint, but must
respond with specific facts showing the existence of a genuine factual issue to be tried. .
. .  These facts may be shown 'by any of the kinds of evidentiary materials listed in Rule
56(c), except the mere pleadings by themselves.'"  Southway v. Central Bank of Nigeria,
149 F. Supp.2d 1268, 1273 (D. Colo. 2001), aff'd, 328 F.3d 1267 (10th Cir. 2003).
However, "[i]n order to survive summary judgment, the content of the evidence that the
nonmoving party points to must be admissible. . . .  The nonmoving party does not have
to produce evidence in a form that would be admissible at trial, but '"the content or
substance of the evidence must be admissible."' . . .  Hearsay testimony that would be
inadmissible at trial cannot be used to defeat a motion for summary judgment because
'a third party's description of a witness' supposed testimony is "not suitable grist for the
summary judgment mill."'"  Adams v. American Guarantee & Liability Ins. Co., 233 F.3d

9

1242, 1246 (10th Cir. 2000).

"Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response." <u>Southway</u>, 149 F. Supp.2d at 1273. "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . . Unsupported allegations without 'any significant probative evidence tending to support the complaint' are insufficient . . . as are conclusory assertions that factual disputes exist." <u>Id.</u>; <u>Robertson</u>, 78 F. Supp.2d at 1146 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); quoting <u>White v. York Int'l Corp.</u>, 45 F.3d 357, 360 (10th Cir. 1995)). "Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment." <u>Southway</u>, 149 F. Supp.2d at 1274. "Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party." <u>Id.</u> at 1273.

Plaintiff is proceeding *pro se.* The court, therefore, reviews his pleadings and other papers liberally and holds them to a less stringent standard than those drafted by attorneys. <u>Trackwell v. United States Government</u>, 472 F.3d 1242, 1243 (10th Cir. 2007). <u>See</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint to less stringent standards than formal pleadings drafted by lawyers). However, a *pro se* litigant's conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based. <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove

10

facts that have not been alleged or that a defendant has violated laws in ways that a

plaintiff has not alleged.  <u>Associated Gen. Contractors of Cal., Inc. v. California State</u>

<u>Council of Carpenters</u>, 459 U.S. 519, 526 (1983).  <u>See</u> <u>Whitney v. New Mexico</u>, 113

F.3d 1170, 1173-74 (10th Cir. 1997) (court may not supply additional factual allegations

to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf); <u>Drake</u>

<u>v. City of Fort Collins</u>, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not

"construct arguments or theories for the plaintiff in the absence of any discussion of

those issues).  "The plaintiff's *pro se* status does not entitle him to application of

different rules."  <u>Wells v. Krebs</u>, 2010 WL 3521777, at *2 (D. Colo. Sept. 1, 2010).

**Eleventh Amendment.**  Plaintiff sues defendants in their official and individual

capacities.   Defendants correctly assert that plaintiff's claim for damages against them

in their official capacities is barred by the Eleventh Amendment.  "A suit against an

individual officer of a government agency in his or her official capacity is really 'only

another way of pleading an action against an entity of which an officer is an agent.'"

<u>Kennedy v. Finley</u>, 2011 WL 3236174, at *3 (D. Colo. July 28, 2011) (quoting <u>Kentucky</u>

<u>v. Graham</u>, 473 U.S. 159, 165 (1985)).  "[A] plaintiff seeking to recover on a damages

judgment in an official-capacity suit must look to the government entity itself."  <u>Id.</u>

(quoting <u>Kentucky v. Graham</u>, 473 U.S. at 165)).  Here, plaintiff seeks only monetary

damages.  Therefore, the official capacity claims against the defendants should be

dismissed.

**<u>Claim One.</u>**

<u>Retaliation.</u>   In Claim One, plaintiff alleges that Farrell and Snead retaliated

11

against him for prior complaints he made against BVCF's Mental Health Staff by placing him on a Mental Health Watch (suicide watch) between August 31, 2010, and September 7, 2010. It is well-settled that "'[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his' constitutional rights." Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998). Plaintiff may make a showing of retaliation by demonstrating the following: 1) he engaged in constitutionally protected activity; 2) defendants' actions caused plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and 3) defendants' "adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." Shero v. City of Grove, Okla., 510 F.3d 1196, 1203 (10th Cir. 2007) (citing Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)). The third element requires that the plaintiff show that defendants' retaliatory motive was a "but for" cause of the defendants' actions. Smith v. Maschner, 899 F.2d 940, 949-50 (10th Cir. 1990).

"An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of [his] constitutional rights." Peterson, 149 F.3d at 1144 (quotation omitted) (emphasis in original). Factual allegations consisting only of engagement in protected activity, for example filing prison grievances, "[do] not establish the requisite causal connection for [a] retaliation claim. If it did, litigious prisoners could claim retaliation over every perceived slight and resist summery judgment simply by pointing to their litigiousness." Strope v. Cummings, 381 Fed. App'x 878, 883 (10th Cir. 2010) (unpublished). Furthermore, temporal proximity between protected activity and a challenged prison action does not, in itself, demonstrate the

12

causal nexus for a retaliation claim.  See Friedman v. Kennard, 248 Fed. App'x 918,

922 (10th Cir. 2007) (citing cases) ("Standing alone and without supporting factual

allegations, temporal proximity between an alleged exercise of one's right of access to

the courts and some form of jailhouse discipline does not constitute sufficient

circumstantial proof of retaliatory motive to state a claim.").

       In this case, plaintiff's allegations do not establish the requisite causal connection

for a retaliation claim.  Like the plaintiff in Strope, plaintiff's "attribution of retaliatory

motive is conjectural and conclusory."  Strope, 381 Fed. App'x at 883.  Plaintiff has not

shown that "but for" Farrell's and Snead's alleged desire to retaliate against him, he

would not have been placed on suicide watch for this short period.  Farrell's clinical

notes indicate that when she met with the plaintiff on August 31, 2010, she did so

pursuant to a referral from a Captain after the Captain had spent two hours talking with

plaintiff about his "numerous and varied concerns and fears."  (Docket No. 72-1 at 18).

While Farrell's clinical note from that day is consistent with plaintiff's claim that he stated

he did not intend to hurt himself at that time, the clinical note also states that plaintiff

reported to Farrell that he reached a seven on a ten-point suicide scale, with ten being

actively engaged in an attempt, and that he was rapidly approaching the danger zone

with regard to self-harm.[3]  In addition, Farrell attests in her affidavit that on August 31,

_____

       [3]In the  "CLINICAL NOTE  – (DAP) Data-Assessment" from August 31, 2010,
Farrell reported:

       D: **Met with offender per referral from Captain after Captain had spent
       2 hours talking with offender about his numerous and varied
       concerns and fears.  Offender reports that he has reached a 7 on 10
       point Suicide Scale with 10 being actively engaged in an attempt.  He
       reports that he has become adept at registering his body's signals in**

13

2010, plaintiff made it clear that he could not contract for his personal safety.  (Docket

No. 72-1 at 2, ¶ 12).  Farrell attempted to meet with plaintiff on the following day for a

twenty-four hour follow up, but plaintiff remained covered under his safety blanket and

refused to reply to direct questions regarding his general well being as well as his

feeling suicidal and whether he was willing to return to General Population.  The Clinical

Note of this attempted meeting indicates that Farrell made an assumption after talking

---

**alerting him to the fact that he is rapidly approaching the danger zone with regard to self-harm.  He reports that he is not contemplating a method nor does he intend to harm himself at this time.  But it is firm in stating that if he is left in General Population, he will snap.**  He states that he has not slept since last we spoke (3 days/nights) and is exhausted But his level of paranoia (he is certain someone will rush him and stab his eyes out; certain that staff will take things from his legal box; certain that other offenders will steal from him, etc.) makes living in GP with a cellie impossible.  He states that he really has tried to make it in GP (3 weeks in Lower North and 3 weeks on South) but can no longer sustain the effort because he cannot sleep due to his hyper vigilence.  Has a long history of not being able to maintain with a cell mate.

Offender is very matter-of-fact about his situation and describes his efforts to overcome the feelings of paranoia and being overwhelmed.  He tends to drift off into discussion of global guilt and sorrow for the state of affairs of the world and comparing his status to those less fortunate, as well as lamenting the fact that he is where he is at age 39 and that he wants to be out counseling youth and helping people.  Claims to have made contacts with various organizations in this regard and claims to have almost reached the status where he could actualize his goals when he self-sabotages and returns to prison.

A: Suicidal Ideation increasing as offender's physical resources are compromised by lack of sleep and food and water.  ASPD; Narcissistic PPO: ETOH dependence; Borderline PDO; R/O Anxiety Disorder NOS

P: Continue to monitor per Mental Health protocol within 24 hours.  Continue to discuss potential benefits of medication.

(Docket No. 72-1 at 18) (emphasis in bold added).

14

with the officers in Segregation that plaintiff was doing fine on watch but that nothing had changed regarding his willingness to return to General Population.  Therefore, the orders remained unchanged.  (Docket No. 72-1 at 4, ¶ 22; 72-1 at 19).

Thereafter, Snead took over the clinical assessments during daily visits to plaintiff at his Mental Health Watch cell.  (See Docket No. 72-2-Snead Affidavit).  One of Snead's Clinical Notes reports that the plaintiff refused to contract for safety, saying, "I refuse to sign any contract."  Snead noted therein that plaintiff "has been placed on many [Mental Health] Watches at many facilities the last 2 years usually for threats of self harm, then acting out to continue being on watch.  Risk for problem behavior since offender knows what contreacting [sic] for safety is and he refuses to do it; Moderate to High [assessment]."  (Docket No. 72-2 at 6).  Snead repeatedly obtained medical approval for the watch extension.  (See Docket No. 72-2 at 6, 7, 9).

Plaintiff disagrees with these two defendants' assessments concerning the need for this particular Mental Health Watch.  He alleges he merely asked Farrell for a single cell where he could get some sleep, and he thus asserts that protective custody would have been appropriate.  Nevertheless, he has not shown that their actions were taken because they were motivated to retaliate against him.  Based upon the plaintiff's reported lack of sleep, increased ideation, threats that he would "snap," and his history of multiple suicide threats and attempts, plaintiff has not shown that defendants' alleged retaliatory motive was a "but for" cause of the defendants' actions in placing him on this Mental Health Watch.

Conditions of Mental Health Watch Cell.  Plaintiff complains about the conditions of his cell while on this Mental Health Watch.  In particular, he alleges the cell was cold,

he was stripped naked, his toilet was smeared with feces, there was blood on the wall

and floor, and that for some of the later part of his residency, the plumbing was shut off

by the defendants, thereby not allowing him to flush his waste and vomit.  In addition, he

claims he was not allowed to wear underwear, shower, brush his teeth, wash his hands

with soap, or eat his meals with a utensil.  He allegedly had no fresh air, exercise, or

reading material.

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane

conditions of confinement guided by 'contemporary standards of decency.'"  Penrod v.

Zavaras, 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting Estelle v. Gamble, 429 U.S. 97,

103 (1976)).  Accordingly, prison officials must "ensur[e] inmates receive the basic

necessities of adequate food, clothing, shelter, and medical care and . . . tak[e]

reasonable measures to guarantee the inmates' safety."  Barney v. Pulsipher, 143 F.3d

1299, 1310 (10th Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)).

"To prevail on a 'conditions of confinement' claim under the Eighth Amendment, an

inmate must establish that (1) the condition complained of is sufficiently serious to

implicate constitutional protection, and (2) prison officials acted with deliberate

indifference to inmate health or safety."  DeSpain v. Uphoff, 264 F.3d 965, 97 (10th Cir.

2001) (quotations omitted).  However, "[t]he Eight Amendment's prohibition on cruel and

unusual punishment does not mandate comfortable prisons, and conditions imposed

may be restrictive and even harsh."  Id. at 973.  "An inquiry into conditions of

confinement by necessity relies on the particular facts of each situation; the

circumstances, nature, and duration of the challenged conditions must be carefully

considered. . . .  While no single factor controls the outcome of these cases, the length

of exposure to the conditions is often of prime importance.  For example, a filthy, overcrowded cell and a diet of grue might be tolerable for a few days and intolerably cruel for weeks or months."  Id. at 974 (quotations and internal citation omitted).

Here, summary judgment should be entered for Farrell on this claim.  The undisputed evidence shows that she was responsible for plaintiff only while plaintiff was confined in this cell for the first two days, after which Snead assumed the mental health assessment duties.  On August 31, Farrell ordered that plaintiff may have hygiene items (but no razor or sharps), eating utensils, a blanket for 24 hours, a soft cover book (at DOC employee/contract worker discretion), legal box, tablet, pen, boxers, t-shirt, and socks.  (Docket No. 72-1 at 20).  The following day, she completed a slightly different form on which she did NOT check off an order for "No hygiene items" but prohibited sharps and a razor, and she allowed clothing, a blanket for 24 hours, boxers, socks, spork, cup, pillow, flex pen, and legal property.  (Docket No. 72-1 at 21) (emphasis added).  She denies observing either blood or feces in plaintiff's cell when she went to meet with him on September 1, 2010 (Docket No. 72-1 at 4), at which time plaintiff was completely covered beneath his blanket and did not want to talk.  (Docket No. 72-1 at 19).  Furthermore, she was not on call when the plumbing was allegedly turned off.

Although plaintiff alleges in his Amended Complaint that he complained to security staff about the cleanliness of his cell, and they said they would let Farrell know, plaintiff has submitted no evidence that Farrell knew of any of the alleged deficiencies in the plaintiff's condition of confinement.  Furthermore, given the very short duration that Farrell was on call, as well as the fact that her coverage was at the commencement of plaintiff's placement in that cell, this court finds that plaintiff has not stated a claim

against Farrell with regard to the cleanliness.  See DeSpain, 264 F.3d at 974 (noting

that the court has held that a situation involving filthy cells, poor lighting, inadequate

ventilation or air cooling, and unappetizing food simply did not rise to the level of a

constitutional violation where prisoners were exposed to the conditions for only 48

hours).

     The court also finds that summary judgment should enter with respect to

defendant Snead regarding all claims about the conditions of plaintiff's confinement

except the claims regarding cleanliness and lack of water/inability to flush the toilet.

The Mental Health Watch Monitoring forms report that the plaintiff was regularly

monitored by staff, at 15- and 30-minute intervals (Docket No. 72-1 at 6-17), and

contain a notation on September 3, 2010, at "1845" that plaintiff refused a shower.   In

addition, like Farrell, Snead completed daily order forms.  On September 2 and 3, 2010,

he likewise did NOT check off the order for "No hygiene items" but prohibited sharps

and a razor.  While unlike Farrell he did not allow clothing, he allowed a safety smock

and safety blanket, a soft cover book, a spork (but noted it was to be returned to staff

after use), a pillow, and a flex pen and access to legal work if requested.  (Docket No.

72-1 at 22, 23).  The forms for the next three days, September 4, 5, and 6, had the

same orders except there was no mention of a flex pen and legal work or a provision for

a book.  (Docket Nos. 72-1 at 24-26).  In addition, on the September 4 form, it was

noted that plaintiff refused a shower on September 3 at 1845 hours.  (Docket No. 72-1

at 24).  It was indicated on the September 7 form that the Mental Health Watch was

discontinued.  (Docket No. 72-1 at 27).

     Therefore, while plaintiff complains that the cell was cold, Snead authorized a

18

safety smock and a safety blanket.  In addition, Snead authorized hygiene items and a spork to use to eat, and the monitoring report indicates that a shower was authorized. However, this court finds that there is a genuine issue of material fact with respect plaintiff's Eighth Amendment claim against Snead regarding the cleanliness of the cell and lack of water for several days and whether Snead knew of and disregarded an excessive risk to plaintiff's health and safety.  Plaintiff avers that starting on September 3 he vomited repeatedly (Docket No. 91 at 12) and that on either on September 4 or 5 Snead shut off plaintiff's sink and toilet, noting that Mental Health has a control box outside the three observation cells allowing them to shut off the sink and toilet (Docket No. 91 at 13).  Plaintiff claims he was dehydrated yet could not access water and could not flush the vomit, urine, etc.  In fact, the filled toilet allegedly went unflushed for days. (Docket No. 91 at 13).  Plaintiff avers he "complained to Snead each day he came by- the 2nd through the 10th - to no avail.  Snead had opportunity after opportunity to provide relief."  (Docket No. 91 at 12).  In his Affidavit, Snead merely states that he does not recall observing blood or feces in plaintiff's Mental Health Watch cell when he went to his cell to meet with him on September 1, 2010.  (Docket No. 72-2 at 4, ¶ 21).  No averments are made, however, regarding the remainder of the time plaintiff was in the Watch cell. "While there is no doubt that toilets can be unavailable for some period of time without violating the Eighth Amendment, . . . exposure to human waste carries particular weight in the conditions calculus."  DeSpain, 264 F.3d at 974 (quotations and citation omitted) (listing cases).  "Whether an official had the requisite knowledge of a substantial risk and ignored that risk is a question of fact."  Id. at 975 (quotation omitted).  Therefore, this claim against Snead should withstand defendants' summary

19

judgment motion.

Medical Care.  In order to state an Eighth Amendment claim, "'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'"  Self v. Crum, 439 F.3d 1227, 1230 (10th Cir.) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  "A medical need is serious if it has been diagnosed by a doctor or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996) (citation and internal quotation omitted).  In this case, plaintiff has merely alleged that he had flu-like symptoms, namely, vomiting, stomach cramping, and some diarrhea.  He admittedly became ill after Farrell was no longer on call.  Therefore, he has not stated a claim against Farrell with respect to the denial of medical care.  Furthermore, plaintiff has made no showing of any pre-existing or other condition that would make such a stomach bug a "serious medical need" that has been diagnosed by a doctor or that would easily be recognized as requiring a doctor's attention.  Merely having the symptoms averred by plaintiff does not constitute a serious medical need.  See Kennedy v. Dallas Police Dep't, 2007 WL 30260, at *4 (N.D. Tex. Jan. 4, 2007) ("flu-like symptoms" described as a fever of 101-02 degrees, a sore throat, and a hoarse voice did not constitute "serious harm" necessary to establish an Eighth Amendment violation) (citing Liggins v. Barnett, 2001 WL 737551, at *6 (S.D. Iowa May 15, 2001) ("The court has found no case in which a plaintiff suffering from flu-like symptoms . . . has been held to have had a serious medical need."); Schwartz v. Jones, 2000 WL 1859012, at *3 (E.D. La. Dec. 18, 2000) (failure to provide prisoner with aspirin for flu-like symptoms did not give rise to a federal constitutional claim for denial of medical

20

care); Haberstick v. Nesbitt, 1998 WL 472447, at *3 (E.D. Pa. Jul. 29, 1998) (flu-like

symptoms could not form the basis of a deliberate indifference claim where prisoner

presented no evidence that flu was a serious medical need); Ware v. Fairman, 884 F.

Supp. 1201, 1206 (N.D. Ill. 1995) (describing flu as "not serious")).  In addition, the

defendants have shown that the plaintiff's medical record reflects that plaintiff did not

seek medical care for these symptoms from the time he was released from the Mental

Health Watch until the time he was released in January 2011.  In fact, the only medical

record for plaintiff between those dates is a Transfer Health Screening Form dated

January 11, 2011, which is signed by plaintiff and on which he confirms that he was not

being treated for a medical condition at that time nor did he then have a medical, dental,

or mental health complaint.  (Docket No. 95-2 at 2, 5).  The court thus finds that

summary judgment should enter for the defendants on plaintiff's Eighth Amendment

medical care claim.

Substantive Due Process.  "To show a deprivation of a protected interest . . . in

violation of substantive due process protection, a plaintiff must demonstrate that the

government officials acted in a manner 'so egregious, so outrageous, that it may fairly

be said to shock the contemporary conscience.'" Deray v. City of Colorado Springs,

Colo., 2012 WL 1901220, at *6 (D. Colo. May 25, 2012) (quoting Ellis ex rel. Estate of

Ellis v. Ogden City, 589 F.3d 1099, 1101 (10th Cir. 2009)).  "'The "ultimate" standard for

determining whether there has been a substantive due process violation is whether the

challenged government action shocks the conscience of federal judges.'" Id. (quoting

Graves v. Thomas, 450 F.3d 1215, 1220 (10th Cir. 2006)).  "To satisfy this standard, a

plaintiff must do more than show that the government actor intentionally or recklessly

21

caused injury to the plaintiff by abusing or misusing government power.  Instead, a

plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or

actual harm that is truly conscious shocking."  Livsey v. Salt Lake County, 275 F.3d 952,

957-58 (10th Cir. 2001) (quoting Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 528

(10th Cir. 1998)).  Plaintiff has not made such a showing here, and therefore it is

recommended that defendants' motion for summary judgment be granted on this claim.

Equal Protection.  The Equal Protection Clause of the Fourteenth Amendment

provides that "[n]o State shall make or enforce any law which shall . . . deny to any

person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend XIV,

§ 1.  The Fourteenth Amendment's equal protection guarantee "is essentially a directive

that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne

Living Ctr., 473 U.S. 432, 439 (1985).  "In order to assert a viable equal protection

claim, plaintiff[] must first make a threshold showing that [he was] treated differently

from others who were similarly situated to [him]."  Barney v. Pulsipher, 143 F.3d 1299,

1312 (10th Cir. 1998).  "[T]o state an equal protection claim where no suspect class is

involved," plaintiff must not only show that he is similarly situated to other inmates who

were treated differently, but he must also show that "the difference in treatment bears

no rational relation to legitimate penological interests."  Deberry v. Davis, 2011 WL

1258509, at *4 (D. Colo. Mar. 31, 2011) (citing Fogle v. Pierson, 435 F.3d 1252, 1261

(10th Cir. 2006)).

Plaintiff has made no such showing here.  Defendants correctly point out

plaintiff's inconsistent allegations.  He alleges that he and a battery of BVCF inmates

also endured untenable conditions in this mental health unit but then contends that he

alone was subject to them.  (Compare Docket No. 91 at 24 and 29 with Docket No. 91

at 31).  Furthermore, while he alleges that inmates were on a Mental Health Watch in

the same area and at the same and other times time yet were allowed showers and

heat and were medically checked daily, even if accepted as true, plaintiff has not

established that these inmates were actually similarly situated.  Each individual has

unique medical and mental health needs and risks which could account for differing

accommodations and medical checks while on a Mental Health Watch.

**Claim Two.**  The court recommends that defendants' motion for summary

judgment be granted on Claim Two.

Conspiracy and Personal Involvement.  Plaintiff has not established the personal

involvement of defendant Korth in any constitutional violation or that there was a

conspiracy between Korth and Libal.  "Individual liability under § 1983 must be based on

personal involvement in the alleged constitutional violation."  Foote v. Spiegel, 118 F.3d

1416, 1423 (10th Cir. 1997).  "Because vicarious liability is inapplicable to . . . § 1983

suits, a plaintiff must plead that each government-official defendant, through the

official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556

U.S. 662, 676 (2009).  "Allegations of conspiracy may . . . form the basis of a § 1983

claim. . . . However, a plaintiff must allege specific facts showing an agreement and

concerted action amongst the defendants. . . .  'Conclusory allegations of conspiracy

are insufficient to state a valid § 1983 claim.'"  Tonkovich, 159 F.3d at 533 (quoting Hunt

v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1994)).

Here, plaintiff has submitted no evidence of any action by Korth that rises to the

level of a constitutional violation.  In addition, plaintiff has submitted no evidence in

support of his conclusory allegations of a conspiracy between Korth and Libal.   Plaintiff merely asserts that Korth had previously searched plaintiff's cell, that plaintiff complained, that Korth electronically let Libal into plaintiff's cell from the control booth on December 18, and that Korth had been seen and heard talking to Libel that week and day.   Korth affirms in his affidavit, *inter alia*, that he searched plaintiff's cell on October 30, 2010, and November 19, 2010, during which he removed contraband (ketchup, mustard, and salad dressing packets, a pat of butter, and empty baggies); plaintiff complained to him about searching his legal box; he did not search plaintiff's cell on December 18, 2010; he did not remove any legal paperwork from plaintiff's cell; he knew Officer Libal "shook down" plaintiff's cell but did not know the date; and he did not ask Officer Libal to "shake down" plaintiff's cell.  (Docket No. 72-3 at 2-3).  Libal affirms in her affidavit, *inter alia*, that she searched plaintiff's cell on December 18, 2010, because it was on her list of assigned cell searches; when she searched plaintiff's cell that day, she removed "nuisance contraband" that she listed on a Shakedown Slip (Docket No. 72-4); she did not read plaintiff's legal mail or remove his legal box from his cell; and she had no knowledge of plaintiff's involvement with Ms. Ferrell or Mr. Snead. (Docket No. 72-4 at 1-2).

Removal of Legal Materials.  Plaintiff has alleged that during the search on December 18, 2010, Libal removed some affidavits from other inmates which concern Claim One in this action.  Libal denies removing any legal materials, and the Shakedown Slip does not list any legal materials.  She did list a newspaper had been removed, and plaintiff has intimated in his Response that the affidavits may have been inside the newspaper.  (Docket No. 91 at 11).  Even assuming these affidavits were

confiscated, however, plaintiff has merely asserted that they related to Claim One and

has not alleged what the affiants averred in them or shown how their confiscation

actually hindered him in some significant way.  See Clemmons v. Davies, 1996 WL

282283, at *4 (10th Cir. May 29, 1996) (citing Green v. Johnson, 977 F.2d at 1383, 1390

(10th Cir. 1992)).  "To establish prejudice, a prisoner must show that his prosecution of

the underlying action must be affirmatively hindered in some significant way; there must

be actual substantial prejudice to specific litigation." Cooper v. Belcher, 2010 WL

3359709, at *11 (D. Colo. Aug. 25, 2010) (internal quotations omitted).  Here, plaintiff

merely makes conclusory allegations of prejudice.

Retaliation/Harassment.   The law concerning retaliation and harassment stated

above with respect to Claim One is incorporated here.  "[C]ourts have determined that

frequent and retaliatory cell searches which result 'in the violent dishevelment of [the

prisoner's] cell' and cause the prisoner to suffer 'fear, mental anguish, and misery'

constitutes an Eighth Amendment violation."  Chevere v. Johnson, 1994 WL 577554, at

*2 (10th Cir. Oct. 17, 1994) (quoting Scher v. Engelke, 943 F.2d 921, 924 (8th Cir. 1991)

(prison official searched cell ten times in nineteen days constituted an Eighth

Amendment violation)).  See Williams v. Southwoods State Prison, 2007 WL 1752088,

at *3 (D.N.J. June 13, 2007) (plaintiff's allegations of three searches in three days and

harassing disciplinary filings lodged against him solely for harassment were sufficient to

avoid dismissal); Wilfong v. Morris County Corr. Facility, 2006 WL 3392938, at *3-4

(D.N.J. Nov. 21, 2006) (daily searches over eleven days was sufficient to survive motion

to dismiss); Blanks v. Smith, 790 F. Supp. 192 (E.D. Wis. 1992) (prisoner allegation that

his cell was searched almost daily during a two-week period stated a claim under the

Eighth Amendment).  Here, however, plaintiff has not demonstrated that the searches of

his cell were so frequent and/or violent so as to constitute harassment that violates the

Eighth Amendment.  Plaintiff has merely alleged that his cell was searched by Korth in

October 2010, once again by Korth sometime during the following month, on December

7 by another officer, and on December 18 by defendant Libal.  See Cooper v. Belcher,

2010 WL 3359709, at *11 (D. Colo. Aug. 25, 2010) (allegation of cell searches on three

occasions allegedly in retaliation for grievance filings, with no allegation of suffering in

any way from the searches, was insufficient to demonstrate the severe harassment

necessary to give rise to an Eighth Amendment claim).  See also Smith v. Sublett, 1993

WL 6635 (9th Cir. Jan. 14, 1993) (thirteen searches in thirteen months, which was

approximately four times more than other inmates under the same security status and

residing in the same area, and within a few days of filing administrative grievance or

lawsuit, did not sustain an Eighth Amendment claim); Banks v. Beard, 2006 WL

2192015, at *10 (W.D. Pa. Aug. 1, 2006) (fewer than a handful of searches over a

period of several months did not rise to a frequency and level that will support an Eighth

Amendment violation); Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185 (D. N.J.

1993) (jury could not reasonably find that three alleged searches gave rise to an Eighth

Amendment claim); Theodore v. Coughlin, 1986 WL 11456, at *2 (S.D.N.Y. Oct. 7,

1986) ("Standing alone, two cell searches in a week, even with the dumping of plaintiff's

legal papers and other person effects, do not constitute calculated harassment sufficient

to invoke the Eighth Amendment.").  Furthermore, plaintiff's allegations do not establish

the requisite causal connection for a retaliation claim.  Once again, like the plaintiff in

Strope, plaintiff's "attribution of retaliatory motive is conjectural and conclusory."  Strope,

381 Fed. App'x at 883. Plaintiff has not shown that "but for" defendants' alleged desire to retaliate against him, his cell would not have been searched on these few occasions. In fact, plaintiff admits in his Response that he simply does not recall saying anything to Libal about suing the Mental Health Department. (Docket No. 91 at 11).

Equal Protection. The court incorporates the law stated above with respect to equal protection claims. With respect to Claim Two, plaintiff has made no showing that he was singled out for different treatment for an impermissible reason. He merely asserts that his cell was searched before others in December 2010. Therefore, his equal protection claim with respect to his cell searches fails.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that the Defendants' Motion for Summary Judgment (Docket No. 72) be **GRANTED IN PART AND DENIED IN PART**. More specifically, it is recommended that the motion be DENIED with respect to plaintiff's Eighth Amendment claim against defendant Snead regarding the cleanliness of plaintiff's Mental Health Watch cell, including the lack of water and the ability to flush the toilet. In all other respects, it is recommended that the motion be GRANTED.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file**

**and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Date: February 13, 2013          <u>s/ Michael J. Watanabe</u>
      Denver, Colorado          Michael J. Watanabe
                            United States Magistrate Judge